JAMES A. CHUNG and CAROLE CHUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; NELLO TIBERIO and MARILYN TIBERIO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chung v. Commissioner
Docket Nos. 19934-83, 21451-83.
United States Tax Court
T.C. Memo 1986-131; 1986 Tax Ct. Memo LEXIS 478; 51 T.C.M. (CCH) 777; T.C.M. (RIA) 86131; April 1, 1986. Michael J. Christianson, for the petitioners. Michael K. Phalin, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in 1978 Federal income tax of petitioners James A. Chung and Carole Chung and petitioners Nello Tiberio and Marilyn Tiberio equal to $27,615 and $34,954, respectively. The issues for decision are (1) whether petitioners may deduct under section 174 [1] a portion of certain research and experimental *479 expenditures allegedly incurred by a certain limited partnership, and (2) whether petitioners are liable for additional interest, under section 6621(d), on substantial underpayments attributable to tax motivated transactions. FINDINGS OF FACT Petitioners James A. and Carole Chung resided in La Mirada, California, at the time they filed their petition herein. They filed a joint Federal income tax return for 1978 with the Internal Revenue Service Center in Frenso, California. Petitioners Nello and Marilyn Tiberio resided in Marina del Rey, California, at the time they filed their petition herein. They filed a joint Federal income tax return for 1978 with the Internal Revenue Service Center in Fresno, California. The deductions in issue are the respective distributive shares of petitioners James A. Chung (Chung) and Nello Tiberio (Tiberio) in a partnership loss reported by Scientific Instruments Research Institute (SIRI). SIRI was a California limited partnership of which Robert R. Young (Young) was a general partner and Chung *480 and Tiberio were limited partners. [2]
Young possessed both education and experience as an engineer. In or about 1972, Young and 13 other individuals formed Anatronics Corporation (Anatronics) to develop Young's concept for a programmable discrete analyzer system (PDA), on which Young had already begun work at home in his garage. The PDA was an advanced computer-controlled clinical chemistry analyzer for use both in special esoteric chemistry procedures and in routine chemistry tests performed by hospital and independent clinical laboratories. Blood analysis would be a primary application of the PDA. An integral component of the PDA was the spectrophotometer, which uses light to detect and identify various chemical substances. Between 1971 and 1975, Young obtained various patents on the design and components of the PDA. Such patents listed Anatronics as assignee. Obtaining sufficient funding was a constant concern for Young throughout this period. He and the 13 other founders made capital contributions to Anatronics totaling $175,000 from 1972 through 1975. Anatronics *481 Limited Partnership, of which Young and Anatronics were general partners, was formed in March 1973 as a vehicle to raise additional capital for Anatronics without reducing Young's ownership interest in the corporation. Through 1976 the partners contributed a total of $709,000 to the capital of Anatronics Limited Partnership. In 1977 and 1978, Young and other shareholders of Anatronics contributed an additional $558,000 to the corporation through the purchase of additional shares and the exercise of stock options. Anatronics completed its first prototype of the PDA in 1974, which received considerable interest in the industry. In 1976 Anatronics obtained approval from the Food and Drug Administration to market the PDA. As of July 31, 1978, Anatronics was engaged in the fabrication and final assembly of its first four PDAs, one of which was to be delivered to St. Mary Medical Center in Long Beach, California (St. Mary's), for clinical testing. Anatronics planned to start full production of the PDA during the third quarter of 1978 and to ship one unit per month from October 1978 through July 31, 1979, which Anatronics estimated would produce sales and earnings of $1.8 million and *482 $64,000, respectively. As of July 31, 1978, Anatronics anticipated shipping 36, 76, and 144 PDAs in its fiscal years ending July 31, 1980, July 31, 1981, and July 31, 1982, respectively. Anatronics projected sales and earnings for the 1982 fiscal year of $30.6 million and $5.1 million, respectively. Despite its past progress and favorable forecasts, Anatronics experienced considerable financial difficulty after July 31, 1978. On or about that date Anatronics unsuccessfully attempted to establish an $8 million line of credit to finance the production of 14 PDAs, the expansion of its office and manufacturing facilities, the implementation of its marketing program, and an increase in working capital. Unable to attract new capital, Anatronics was barely able to satisfy its overhead expenses during July 31, 1978, through December 23, 1978, even though it was operating with minimal employees. By the latter date the project had exhausted Young's personal net worth, and Anatronics needed additional money to complete development and testing of the PDA. In late 1977 or early 1978, Young attended a financing seminar presented by Paul Harris (Harris), a resident of Georgetown, Grand Cayman, *483 British West Indies. Young remained in contact with Harris after the seminar and indicated to Harris that Anatronics needed additional financing. Harris suggested that Young create a partnership and suggested certain aspects of its structure. SIRI was formed on December 23, 1978, and its general partners were Young and Gene Koon, an attorney. Chung and Tiberio each owned (indirectly, with respect to Tiberio) one-half of a limited partnership unit which constituted a one-sixth limited partnership interest. The partnership agreement of SIRI described its business and purpose as follows: The primary business and purpose of this partnership is research and development for the design and manufacture of biomedical electronic equipment. The Partnership will enter into research and development contracts up to the limits of funding obligations herein. The initial contract will be for the research, design, and development and clinical trial of computer-controlled biochemical analyzers. Any and all patents issued as a result of the contracted research and development will be the sole property of the Partnership. The general partners were not required to contribute assets to SIRI *484 but received their interest in the partnership "by virtue of their efforts and their endeavors in the researching of the market for and the planning and development of organization and promotional activities for biomedical electronic equipment." The partnership agreement provided that the limited partners would contribute $136,000 for each limited partnership unit. Like the other limited partners of SIRI, Chung and Tiberio contributed in cash only one-fourth of the amount provided in the partnership agreement and signed a promissory note in favor of SIRI for the balance. On December 25, 1978, Young traveled to Georgetown to meet with Harris. Several other partners of SIRI followed during the next few days. On December 29, 1978, Young and Harris executed an "Option Agreement" on behalf of the limited partners of SIRI and AFA International (AFA), a Grand Cayman corporation, respectively. The Option Agreement provided that each of the limited partners granted AFA the right to purchase his income distributions from SIRI. The option extended for 10 years and was exercisable by AFA beginning 1 year and 1 day after the date of the agreement. AFA agreed to pay each limited partner *485 an "option premium" equal to the amount of the note that he executed in favor of SIRI and to pay an identical sum upon exercise of the option. That same day SIRI and International Scientific Research Foundation (ISRF), a corporation with principal offices in Georgetown, entered into a "Research and Development Contract." Under such contract SIRI agreed to pay ISRF $2,040,000, through mutually agreeable progress payments, in exchange for ISRF's performing the following functions: 1. Design, construct, document and test a Spectrophotometer designed for use as a component part of biomedical electronic testing equipment, in accordance with a "statement of work" (Attachment Number 1) which is attached hereto and incorporated herein by this reference. 2. Conduct a complete market research study analysis, for the component as it relates to sales and marketing of the component in the International original equipment manufacturing market place, also described in the aforementioned statement of work. 3. Provide periodic reports of progress of the research and development on not less than a quarterly basis as required by the statement of work, to the general partners of SIRI-I Spectrophotometer *486 Project. 4. Provide plans, specifications designs, market studies, and all product documentation to the general partners of SIRI-I, Spectrophotometer Project as available and upon demand. 5. Provide one (1) prototype model of the subject component as suitable for installation in biomedical electronic testing equipment as provided in the statement of work, supervise the installation thereof and supervise the completion of acceptance tests and acceptances defined by the statement of work. (a) Upon completion of acceptance tests and acceptance, the prototype model is to be rendered inoperative and returned to SIRI-I, Spectrophotometer Project for sale as scrap. 6. Design document and implement computer software and firmware required for successful operation of the component in accordance with the statement of work. 7. Engage the services of an attorney, admitted to practice patent law, to complete patent search, applications for patents, and issuance of final patents on the subject component. Young signed the Research and Development Contract on behalf of SIRI, and Harris executed it on behalf of ISRF. The "Statement of Work" referenced in and attached to the Research *487 and Development Contract defined the objective of the project as follows: OBJECTIVE: The objective of the work scope is to design, develop, fabricate, test and evaluate a spectrophotometric device suitable for use in a clinical environment as a self contained microprocessor controlled unit or as a component of a larger unit in accordance with the Functional Unit description herein. The Statement of Work contained detailed technical specifications for the design, characteristics, and function of the spectrophotometer that was the subject of the Research and Development Contract. Also on December 29, 1978, ISRF and Anatronics entered into a "Research and Development Subcontract." Under this contract ISRF agreed to pay Anatronics $1,435,000, through mutually agreeable progress payments, in exchange for Anatronics' performing the following functions: 1. Construct one (1) prototype model of a spectrophotometer in accordance with plans and specifications provided by ISRF and in accordance with the master statement of work provided by Scientific Instruments Research Institute, Phase I, Spectrophotometer Project. 2. Provide ISRF with manufacturing documentation of all construction *488 completed hereunder. 3. Under the supervision of ISRF, conduct acceptance tests as defined by the statement of work. 4. Provide consulting services to ISRF relative to the design and implementation of software and firmware as required by ISRF. The "Statement of Work" attached to the Research and Development Subcontract was identical to that attached to the Research and Development Contract between SIRI and ISRF. Young and Harris signed the Research and Development Subcontract on behalf of Anatronics and ISRF, respectively. Contemporaneously with the execution of the contracts, the various parties transferred cash through their respective bank accounts with the Grand Cayman branch of Barclay's Bank International. AFA transferred the option premiums to the limited partners of SIRI. The limited partners then transferred these funds to SIRI, and Harris wrote "Paid in Full" across each note payable to SIRI given by the limited partners. SIRI transferred $406,000 (which equaled the aggregate initial cash investments of the limited partners plus the aggregate transfers applied to satisfy the notes less $2,000) to ISRF. Young did not meet anyone purportedly on the staff *489 of ISRF before consummating the above transactions. In January 1979, Anatronics received $90,000 from ISRF. On March 23, 1979, Young sent a newsletter to the shareholders of Anatronics, in which he stated: In my letter of March 27, 1978, I told you about initiating an audit to determine our status in response to demands for equity participation by several employees. In a nutshell, the audit was negative and the employees departed. I then launched an all-out effort to overcome our technical shortcomings. In spite of having had severe damage to the System in mid-August, we have done it! Our Spectrophotometer is six times better than the best our competition offers. Our device which dispenses patient samples is approximately four times better than competitive dispensers. Our units which dispense reagents are an order of magnitude better than competition. Our detection cells are producing results about five times better than competition. Most important, we will send System Number 1 to St. Mary's for the start of Clinical Trials on or before April 16, 1979. Obviously, to do what we have done takes money. During 1978, we received $306,610 and paid out $312,960. The breakdown *490 of receipts and disbursements is attached. While these numbers are not a formal financial statement, they do portray a representative picture of what was required to sustain our efforts during the year. In December, 1978, Mr. Gene Koon and I formed a new limited partnership called Scientific Instruments Research Institute (SIRI). The purpose of this limited partnership is to fund companies engaged in high technology research and development in exchange for rights to long-term earnings. The limited partner puts at risk his initial investment plus the proceeds from the sale of an option on the right to purchase his future rights. In effect this 4 to 1 tax shelter moves current taxable income from ordinary tax rates to long-term capital gains rates and then provides for a future income stream. If a 4 to 1 tax shelter is attractive to you, please call me to arrange a complete presentation of the opportunity. In the course of developing the PDA System, we have experienced difficulties which we never expected; but we have overcome them. Even though we are behind our expected schedule, we are still years ahead of competition. We are rapidly approaching the beginning of Clinical *491 Trials and their successful completion means success for Anatronics. We have only ourselves to rely upon, and if we falter now, we will be denied the success we all deserve. If you can participate financially, I encourage you to do so. In April 1979, Anatronics delivered the PDA to St. Mary's for clinical trials. St. Mary's intended to purchase the PDA if testing was successful. Anatronics conducted the trials at St. Mary's for approximately 8 months. During that period an employee or consultant with Anatronics stayed from 9:00 or 10:00 a.m. until late into the night each day (including weekends) at St. Mary's. Young himself was present at St. Mary's during most of this time. Because various echnical problems prevented the PDA from performing satisfactorily during the trial period at St. Mary's, Anatronics transferred the unit to its plant for further development. From the first calendar quarter of 1979 through the first quarter of 1980, ISRF sent quarterly status reports to SIRI as required in the Research and Development Contract. All but the first of these reports indicated that the reports were "based solely on reports from our sub-contractors." ISRF performed no substantial *492 work under the Research and Development Contract. On its U.S. corporation income tax returns for each of the fiscal years ending July 31, 1978, through July 31, 1981, Anatronics reported taxable losses ranging from $587,937 to $1,130,271. On its U.S. partnership return of income for 1978, SIRI reported a deduction for "research and development costs" of $408,000, $406,000 of which consisted of the December 29, 1978 payment to ISRF under the Research and Development Contract. Chung and Tiberio reported their distributive share (indirect, in the case of Tiberio) of such loss in their respective Federal income tax returns for 1978. Respondent denied petitioners' respective deductions for such losses in full. In his amended answer respondent alleged that the increased interest rate provided in section 6621(d) was applicable. OPINION The primary issue before us is whether SIRI's payment of $406,000 to ISFR under the Research and Development Contract constituted a deductible research and experimental expenditure under section 174(a). [3] Respondent argues, among other things, that petitioners have not proven that any amount was spent for research and development or that petitioners *493 had the necessary basis in their partnership interests to deduct the partnership losses. Petitioners contend that respondent is merely suspicious because the investors went to the Caymen Islands. Except as to new matters not raised in the statutory notice of deficiency, respondent's determination is presumed correct, and the taxpayer bears the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. Based upon the entire record, we conclude that petitioners have failed to satisfy their burden of proving that SIRI paid or incurred any deductible research and experimental expenditures in 1978. The crux of petitioners' argument, *494 based upon the testimony of Young at trial, is that SIRI was developing a "second spectrophotometer," different from that used in the PDA, for industrial application. The evidence, however, supports the stronger inference that Young merely used SIRI and the Cayman entities as conduits for additional infusions of capital to be used by Anatronics to develop the PDA. Young testified that the "second spectrophotometer" might be used in testing milk, petroleum, and other nonmedical fluids. Both the partnership agreement of SIRI and the Research and Development Contract between SIRI and ISRF, however, described the subject of the venture as biomedical electronic equipment. Although Chung and another limited partner of SIRI agreed with Young's testimony, two other limited partners testified that they believed SIRI to be involved in the development of a "blood analyzer" or a "machine that was to test blood." The only reasonable inference from Young's description of SIRI in the March 1979 newsletter requesting additional funding for Anatronics' development of the PDA is that SIRI would be used to provide such funding. There is no mention of a new product or venture. Whereas Anatronics *495 held patents on the PDA, including its component spectrophotometer, there is no evidence that SIRI owned even minimal rights to any spectrophotometer, or that SIRI would ever engage in a trade or business. Cf. Green v. Commissioner,83 T.C. 667, 686-687 (1984). This void is particularly significant in light of Young's testimony acknowledging that the purported second spectrophotometer was based upon the same concepts as that contained in the PDA. The various agreements involving SIRI, Anatronics, AFA, and ISRF indicate that the overall arrangement involved nothing more than the circular flow to Anatronics of most of the initial cash contributed by the SIRI limited partners, most of whom were Anatronics investors. [4] Harris represented both AFA and ISRF; the option premium from AFA to each limited partner exactly equaled the amount of the note given by the partner to SIRI; the aggregate of all such payments plus the partners' initial cash contributions (less $2,000) was transferred back to ISRF; and both the signing of the various contracts and the associated transfers of cash occurred on the same day. Young admitted that he did not meet the staff of ISRF prior *496 to his engaging ISRF to perform this extremely technical purported development project. Indeed, nothing indicates that Young knew or cared, nor can we determine, whether ISRF even had employees or was simply a shell created by Harris. Young's indifference was quite understandable, however, because ISRF performed no substantial work on the Research and Development Contract. As of early 1979, Anatronics believed that it was close to completion of the PDA and was operating with a minimal work force. Young spent substantially all of his time testing the PDA at St. Mary's beginning in April 1979. We do not believe that Anatronics possessed the ability or the inclination to embark upon development of a new device for SIRI when Anatronics was on the threshold of what it expected to be a very profitable exploitation of the PDA. [5] Petitioners did not produce any work schedules, expenditure *497 records, or any other documentary evidence or other corroboration indicating that Anatronics performed any work on a second spectrophotometer.The quarterly reports sent by ISRF to SIRI are no more than vague recitals, based primarily on summaries prepared by Young. Neither details nor supporting source materials have been provided by Young or by petitioners. *498 Because petitioners have not persuaded us that SIRI paid or incurred any expenditures for research or experimentation, we hold for respondent on this issue. Petitioners have not explained the additional $2,000 loss reported by SIRI except by Young's statement that it was spent for operating expenses. He did not identify such expenses, and there is no evidence that they were indeed deductible items. We hold for respondent with respect to this amount. Respondent argues that petitioners are subject to the increased interest rate prescribed in section 6621(d), because their investment in SIRI constituted an activity not engaged in for profit. See section 301.6621-2T, Q-4, and A-4, Proced. & Admin. Regs. (Temporary). We deny petitioners' respective deductions for reasons other than lack of profit motive. Section 6621(d) applies only to specifically enumerated tax motivated transactions and is therefore inapplicable. See Law v. Commissioner,84 T.C. 985, 993 (1985). Decisions will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended an in effect during the year in issue.↩
2. Tiberio owned his partnership interest in SIRI through a general partnership with another individual.↩
3. Section 174(a)(1) provides: (a) Treatment as Expenses.-- (1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.↩
4. Young testified that Anatronics received $81,000 from ISRF subsequently to the receipt of $90,000 in January 1979. Even if true, and Anatronics' bank statements and deposit slips do evidence unidentified deposits in such amount, this fact does not affect our conclusion as to the arrangement.↩
5. A limited partner of SIRI testified that the success of the purported second spectrophotometer would benefit the reputation of Anatronics, and Young testified that cash from sales of the "second" spectrophotometer could be used to fund Anatronics development of the PDA. Young's testimony on this issue was both vague and contradictory: Q. You said you had profit in the contract. What contract do you refer to? A. That was in the ISRF Anatronics contract. Q. You mean Anatronics was to earn a profit performing those services? A. Anatronics was going to perform services for ISRF under contract, yes, to develop the SIRI spectro. Q. And you anticipated a profit to Anatronics for performing those services? A. Yes, we did. Q. Is this how you intended for SIRI to benefit Anatronics? A. That way, plus the cash flow that would be developed or generated by the sale of the SIRI spectro. Q. Except that cash flow belongs to SIRI; is that correct? A. Certainly the profits did, but the cash flow would go to the manufacturer. Q. Did you intend for Anatronics to ultimately manufacture the SIRI spectro? A. That was the intent. It hadn't been fully agreed upon.↩